1
2
3
4
5                    **UNITED STATES DISTRICT COURT**
6                    **EASTERN DISTRICT OF CALIFORNIA**
7

| | |
|---|---|
| 8  **CHICKEN RANCH RANCHERIA OF** | **CASE NO. 1:19-CV-0024 AWI SKO** |
| **ME-WUK INDIANS, BLUE LAKE** | |
| 9  **RANCHERIA, CHEMEHUEVI INDIAN** | **ORDER RE: CROSS MOTIONS FOR** |
| **TRIBE, HOPLAND BAND OF POMO** | **SUMMARY JUDGMENT** |
| 10 **INDIANS, and ROBINSON** | |
| **RANCHERIA** | |
| 11 | |
| **Plaintiffs,** | |
| 12 | |
| 13 **v.** | **(Docs. 35 and 38)** |
| 14 **GAVIN NEWSOM, Governor of** | |
| **California, and STATE OF** | |
| 15 **CALIFORNIA,** | |
| 16 **Defendants.** | |

17                          **I. Background**

18         The Indian Gaming Regulatory Act ("IGRA") set up a statutory basis for the operation and

19  regulation of gaming by Indian tribes.  Three classes of gaming were defined.  Class I and II

20  consist of social games, bingo, and non-banking card games.  Class III is the residual category and

21  consists of what is common thought of as Nevada style gambling.  In order for an Indian tribe to

22  conduct class III gaming it must, among other things, enter into a compact with the state in which

23  they are located.

24         The State of California entered into class III gaming compacts with a number of Indian

25  tribes in 1999 ("1999 Compacts").  The 1999 Compacts are set to end on December 31, 2020 with

26  an automatic extension to June 30, 2022.  Plaintiffs Chicken Ranch Rancheria of Me-Wuk Indians,

27  Blue Lake Rancheria, Chemehuevi Indian Tribe, Hopland Band of Pomo Indians, and Robinson

28  Rancheria ("Tribal Plaintiffs") have 1999 Compacts with California.  In 2014, the Tribal Plaintiffs

joined several other Indian tribes who have 1999 Compacts to form the Compact Tribes Steering Committee ("CTSC").  In 2015, the CTSC and California started to negotiate the terms of a new agreement on class III gaming to replace the 1999 Compacts which were coming to the end of their terms.  Negotiations took place over the next few years.  Dissatisfied with the negotiations, Tribal Plaintiffs filed suit against The State of California and Governor Gavin Newsom ("State Defendants") on January 4, 2019.  The Tribal Defendants withdrew from the CTSC on September 26, 2019.

The Tribal Plaintiffs and State Defendants have filed cross motions for summary judgment which cover the same subject matter.  The parties agree on the nature of the dispute.  The State Defendants summarize it as: "The Plaintiff Tribes allege in their Second Amended Complaint for Declaratory and Injunctive Relief (SAC) that the State Defendants violated the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. §§ 2710-2712, 18 U.S.C. §§ 1166-1167.  Specifically, the Plaintiff Tribes allege that during class III gaming compact negotiations the State Defendants insisted that they agree to include subjects in their new compacts that violate IGRA." Doc. 38-1, 1:6-8.  The Tribal Plaintiffs agree that their claim is that "the State's take it or leave it offer, which included improper subjects of negotiation and an illegal tax" constituted a failure on the part of the State Defendants to "negotiate[e] in good faith" under IGRA. Doc. 35-1, 1:24-26.  For evidence, the parties have provided a record of negotiations ("RON"). Docs. 34-1 through 34-24.

## II. Legal Standard

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v. American Multi-Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004).

## III. Discussion

**A. IGRA**

IGRA states that "Any Indian tribe having jurisdiction over the Indian lands upon which a

class III gaming activity is being conducted, or is to be conducted, shall request the State in which such lands are located to enter into negotiations for the purpose of entering into a Tribal-State compact governing the conduct of gaming activities. Upon receiving such a request, the State shall negotiate with the Indian tribe in good faith to enter into such a compact." 25 U.S.C. § 2710(d)(3)(A).  The good faith negotiation requirement of IGRA is not without teeth.  Sections 2710(d)(7)(B)(i)-(vii) provide a detailed remedial scheme designed to prevent a State from seeking to wrongfully inhibit an Indian tribe from engaging in class III gaming activity.  Under that procedure, 180 days after an Indian tribe requests the opening of negotiations with the state, that Indian tribe may bring suit to (1) compel a state to enter into negotiations with the tribe for the purpose of entering into a compact, or (2) to compel a state to negotiate in good faith. 25 U.S.C. § 2710(d)(7)(B)(i); 25 U.S.C. § 2710(d)(7)(A)(i).  In such an action, an Indian tribe must first introduce evidence that (1) a compact has not been entered, and (2) the state (a) did not respond to the request to negotiate, or (b) did not respond to the request in good faith. 25 U.S.C. § 2710(d)(7)(B)(ii).  Thereafter, the burden shifts to the State to prove that it negotiated in good faith to conclude a compact. 25 U.S.C. § 2710(d)(7)(B)(ii).

Importantly for the case at hand, IGRA sets out the provisions that may be contained in a compact governing class III gaming (25 U.S.C. § 2710(d)(3)(C)(i-vii)) and what courts may consider in determining whether the a state negotiated in good faith (25 U.S.C. § 2710(d)(7)(B)(iii)(I) and (II)).  A compact may contain provisions relating to:

> (i) the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of such activity;
>
> (ii) the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations;
>
> (iii) the assessment by the State of such activities in such amounts as are necessary to defray the costs of regulating such activity;
>
> (iv) taxation by the Indian tribe of such activity in amounts comparable to amounts assessed by the State for comparable activities;
>
> (v) remedies for breach of contract;
>
> (vi) standards for the operation of such activity and maintenance of the gaming facility, including licensing; and

(vii) any other subjects that are directly related to the operation of gaming activities.

25 U.S.C. § 2710(d)(3)(C).  In determining whether the State has negotiated (regarding the permissible § 2710(d)(3)(C) topics) in good faith, a court

(I) may take into account the public interest, public safety, criminality, financial integrity, and adverse economic impacts on existing gaming activities, and

(II) shall consider any demand by the State for direct taxation of the Indian tribe or of any Indian lands as evidence that the State has not negotiated in good faith.

25 U.S.C. § 2710(d)(7)(B)(iii).

The Ninth Circuit has found that Section 2710(d)(3)(C) provides an exhaustive list of provisions that may be contained in a compact, specifically noting that "IGRA limits [the] permissible subjects of negotiation" to those topics. Rincon Band of Luiseno Mission Indians of the Rincon Reservation v. Schwarzenegger, 602 F.3d 1019, 1028-29 n.9 (9th Cir. 2010).  The Ninth Circuit reasoned that "it is clear from the legislative history that by limiting the proper topics for compact negotiations to those that bear a direct relationship to the operation of gaming activities, Congress intended to prevent compacts from being used as subterfuge for imposing State jurisdiction on tribes concerning issues unrelated to gaming." Coyote Valley Band of Pomo Indians v. Cal. (In re Indian Gaming Related Cases Chemehuevi Indian Tribe), 331 F.3d 1094, 1111 (9th Cir. 2003) ("Coyote Valley II").

An attempt to negotiate (or refusal to negotiate based on) topics not enumerated in Section 2710(d)(3)(C) violates a state's duty to negotiate in good faith. Fort Independence Indian Community v. California, 679 F. Supp. 2d 1159, 1172 (E.D. Cal. 2009).  "[G]ood faith should be evaluated objectively based on the record of negotiations, and that a state's subjective belief in the legality of its requests is not sufficient to rebut the inference of bad faith created by objectively improper demands." Rincon, 602 F.3d at 1041, citing Mashantucket Pequot Tribe v. Connecticut, 913 F.2d 1024, 1033 (2d Cir. 1990).

The sixth and seventh of the enumerated categories act as a catch-all: "The phrases 'standards for the operation of [gaming] activity' and 'any other subjects . . . directly related to the operation of gaming activities' are naturally read as catch-all categories. Viewed in context, those

4

1  terms are broader than the more specific topics enumerated in paragraphs (3)(C)(i)-(v)."

2  Chemehuevi Indian Tribe v. Newsom, 919 F.3d 1148, 1152 (9th Cir. 2019) ("Chemehuevi Indian

3  Tribe").  The general subject of negotiation is a "compact governing the conduct of gaming

4  activities." 25 U.S.C. § 2710(d)(3)(A).  The U.S. Supreme Court has stated that "'class III gaming

5  activity' is what goes on in a casino—each roll of the dice and spin of the wheel." Michigan v.

6  Bay Mills Indian Cmty., 572 U.S. 782, 792 (2014).  Sections 2710(d)(3)(C)(i)-(v) permit

7  negotiations on topics tied "directly related to, and necessary for, the licensing and regulation of

8  such activity." 25 U.S.C. § 2710(d)(3)(C)(i).  Sections 2710(d)(3)(C)(vi) and (vii) then allow a

9  broader discussion of topics "directly related to the operation of gaming activities." 25 U.S.C. §

10  2710(d)(3)(C)(vii).  These operations encompass not only class III gaming itself but also the

11  surrounding cluster of activity that allows the gaming to take place.

12      Against this legal backdrop, the parties disagree as to whether the topics the State

13  Defendants tried to negotiate over were permitted by IGRA.  The State Defendants argue "the

14  Record shows that the State Defendants are not in bad faith because they have never demanded

15  that either the CTSC or the Plaintiff Tribes include in their new compacts topics that are

16  unlawful….These subjects, which include provisions for revenue sharing with non-gaming tribes,

17  mitigation payments to local governments, and protections for basic labor rights, are all proper

18  IGRA negotiation topics.  Moreover, even if any of the topics exceeded IGRA's scope, the State

19  could lawfully negotiate and offer the Plaintiff Tribes meaningful concessions to include them in

20  new compacts." Doc. 38-1, 1:16-23.  The Tribal Plaintiffs have identified (1) state tort laws, (2)

21  state environmental laws, (3) subjecting the Tribal Plaintiffs to the jurisdiction of local

22  governments, (4) recognition and enforcement of state spousal and child support orders, (5) state

23  minimum wage laws, (6) anti-discrimination laws, and (7) labor laws as the topics the State

24  Defendants tried to negotiate over that were not permitted by IGRA. See, Doc. 35-1, page i.

25  Additionally, the Tribal Plaintiffs disagree with the State Defendants' second point and assert that

26  "A meaningful concession cannot, however, be exchanged for the inclusion of provisions that fall

27  outside of the scope of the seven permissible compact subjects identified in 25 U.S.C. §

28  2710(d)(3)(C)." Doc. 35-1, 32:21-24.

**B. Topics of Negotiation**

The State Defendants argue that there is no IGRA violation because these seven issues were only topics of negotiation and never insisted upon: "none of the so-called *demands* identified in the Plaintiffs' Motion constitute either hard-line or take-it-or-leave-it mandates by State Defendants. The Newsom Administration remains willing to negotiate with both CTSC and the Plaintiff Tribes, either individually or collectively, regarding all of these compact topics." Doc. 42, 14:10-13, emphasis in the original.  However, a hard demand is not required for a problem under IGRA standards. "[A] 'hard line' stance is not inappropriate so long as the conditions insisted upon are related to legitimate state interests regarding gaming and the purposes of IGRA." Rincon, 602 F.3d at 1039.  "IGRA limits permissible subjects of *negotiation* in order to ensure that tribal-state compacts cover only those topics that are related to gaming and are consistent with IGRA's stated purpose." Id. at 1028-29, emphasis added.  Raising issues outside the scope of Section 2710(d)(3)(C) is "strong, if not determinative, evidence of bad faith." Fort Independence Indian Community, 679 F. Supp. 2d at 1172 ("topics other than those enumerated by section 2710(d)(3)(C) are prohibited topics of negotiation").  However, offering meaningful concessions may rebut the suggestion of bad faith arising from improper demands. Rincon, 602 F.3d at 1036.

**1. Labor, Minimum Wage, and Anti-Discrimination Law**

The State Defendants sought to include several provisions dealing with employment standards, namely anti-discrimination, minimum wage, and a labor relations ordinance:

> (f) Adopt and comply with tribal law no less stringent than federal laws forbidding harassment, including sexual harassment, in the workplace, forbidding employers from discrimination in connection with the employment of persons to work or working for the Gaming Operation or in the Gaming Facility on the basis of race, color, religion, ancestry, national origin, gender, marital status, medical condition, sexual orientation, age, disability, gender identity, genetic information, military or veteran status, and any other protected groups under California law, and forbidding employers from retaliation against persons who oppose discrimination or participate in employment discrimination proceedings…
>
> ….
>
> (j) Adopt and comply with the Fair Labor Standards Act, 29 U.S.C. § 201 et seq.,

the United States Department of Labor regulations implementing the Fair Labor Standards Act, 29 C.F.R. § 500 et seq., the State's minimum wage law set forth in California Labor Code section 1182.12 and the State Department of Industrial Relations regulations implementing the State's minimum wage law, Cal. Code Regs. tit. 8, § 11000 et seq.  Notwithstanding the foregoing, only the federal minimum wage laws set forth in the Fair Labor Standards Act, 29 Code of Federal Regulations, part 500 et seq., shall apply to tipped employees.

….

Sec. 12.10 Labor Relations. Notwithstanding any other provision of this Compact, and except as otherwise provided by applicable federal law, this Compact shall be null and void if, on or before its effective date, the Tribe has not confirmed the enactment or continuing effect of the Tribal Labor Relations Ordinance set forth in Appendix G to this Compact, and the Gaming Activities may continue only as long as the Tribe maintains the ordinance.  The Tribe shall provide written notice to the State that it has adopted the ordinance, along with a copy of the ordinance as adopted.

Doc. 34-17, RON Vol 16, 9130-31, 9137, and 9145.

The Tribal Plaintiffs assert that all of these topics are "unrelated to the regulation of class III gaming and do not promote the purposes of the IGRA." Doc. 36-1, 24:12-13.  The Tribal Plaintiffs also argue that the minimum wage language exceeded that scope because it "would apply with equal force to all persons employed in the Gaming Operation, not just to those employees responsible for the playing of class III games and for the counting and accounting of gaming revenue generated therefrom." Doc. 35-1, 23:1-5.  This appears to make it roughly consistent with the anti-discrimination provision which would apply to persons "working for the Gaming Operation or in the Gaming Facility." Doc. 34-17, RON Vol 16, 9130.

The catch-all provision of Section 2710(d)(3)(C)(vii) permits negotiation over "any other subjects that are directly related to the operation of gaming activities." 25 U.S.C. § 2710(d)(3)(C)(vii).  The Ninth Circuit has interpreted that provision to cover negotiation over "a labor ordinance addressing only organizational and representational rights and applicable only to employees at tribal casinos and related facilities…. this provision is 'directly related to the operation of gaming activities' and thus permissible pursuant to 25 U.S.C. § 2710(d)(3)(C)(vii). Without the 'operation of gaming activities,' the jobs this provision covers would not exist; nor, conversely, could Indian gaming activities operate without someone performing these jobs." These proposed provisions which cover employment standards fall squarely within the holding of Coyote Valley II, whose reasoning was not limited to employees directly working on class II

7

gaming but rather explicitly to "employees at tribal casinos and related facilities." Id.

Additionally, the Tribal Plaintiffs state that the labor relations provision has been superseded by new case law in Casino Pauma v. NLRB, 888 F.3d 1066 (9th Cir. 2018) which found that the National Labor Relations Act applies to Indian tribes operating casinos. This makes the "inclusion of the [labor relations provision] in their compacts superfluous, unenforceable and needlessly confusing." Doc. 35-1, 26:12-13. However, this does not render it a subject unfit to bring up in negotiation.

These topics are within the scope of 25 U.S.C. § 2710(d)(3)(C)(vii) and the State Defendants' attempts to negotiate are not per se evidence of bad faith. But because these topics are not at the heart of the gaming activity and only somewhat connected (they are not directly related to the class III gaming itself but related to the overall operation of the facilities in which the gaming take place), the state should also provide "meaningful concessions" in exchange for making demands on these topics. See Big Lagoon Rancheria v. California, 759 F. Supp. 2d 1149, 1162 (N.D. Cal. 2010); Coyote Valley II, 331 F.3d at 1111. In Coyote Valley II, the Ninth Circuit concluded that the labor representation provision "falls within the scope of § 2710(d)(3)(C)(vii) and that, under the circumstances of this case, the State did not act in bad faith in requiring that Coyote Valley adopt it or forgo entering a compact…. Given that the State offered numerous concessions to the tribes in return for the Labor Relations provision (including the right to exclusive operation of Las Vegas-style class III gaming in California), it did not constitute bad faith for the State to insist that this interest be addressed in the limited way provided in the provision." Id. at 1115-6.[1]


**2. Tort Law**

In the negotiations, the State Defendants sought to include the provision:

The Tribe shall adopt, and at all times hereinafter shall maintain in continuous force, an ordinance that provides for all of the following:

---

[1] The Ninth Circuit has only discussed "meaningful concessions" in the context of fee demands. See Coyote Valley II, 331 F.3d at 1111; Rincon, 602 F.3d at 1036. The expansion of the requirement to other topics of negotiation relies on the precedent of Big Lagoon Rancheria, 759 F. Supp. 2d at 1162.

(1) The ordinance shall provide that the Tribe shall adopt as tribal law, provisions that are the same as California tort law to govern all claims of bodily injury, personal injury, or property damage directly arising out of, connected with, or relating to the operation of the Gaming Operation, Gaming Facility, or the Gaming Activities, including but not limited to injuries resulting from entry onto the Tribe's land for purposes of patronizing the Gaming Facility or providing goods or services to the Gaming Facility, provided that such injury occurs at the Gaming Facility or on a road accessing the Facility exclusively. California law governing punitive damages and attorney's fees need not be a part of the ordinance. Further, the Tribe may include in the ordinance required by this subdivision a requirement that a person asserting any claim(s) for money damages against the Tribe for bodily injury, personal injury, or property damage file those claims within the time periods applicable for the filing of claims for money damages against public entities under California Government Code section 810 et seq. Under no circumstances shall there be any awards of punitive damages or attorney's fees or costs.

(2) The ordinance shall also expressly provide for waiver of the Tribe's sovereign immunity and its right to assert sovereign immunity with respect to resolution of such claims in the Tribe's tribal court system with jurisdiction over the subject matter, or if there is no tribal court system, by a three-member tribal claims commission with jurisdiction over the subject matter, but only up to the ten million dollar ($10,000,000) Policy limit; provided, however, such waiver shall not be deemed to waive or otherwise limit the Tribe's sovereign immunity for any portion of the claim that exceeds the ten million dollar ($10,000,000) Policy limit, whichever is greater, or for punitive damages or attorneys' fees.

(3) The ordinance shall allow for the claim to be resolved in the Tribe's tribal court system (Tribal Court), or if there is no Tribal Court with jurisdiction over the subject matter, by the three (3)-member Claims Commission). No member of the Claims Commission may be employed by the Gaming Facility or Gaming Operation. Resolution of the dispute before the Tribal Court or Claims Commission shall be at no cost to the Claimant (excluding Claimant's own attorney's fees and expenses). The Tribal Court or Claims Commission must afford the Claimant with a fair dispute resolution process that incorporates the essential elements of due process.

Doc. 34-17. RON Vol. 16, 9139-40. The Tribal Plaintiffs argue that "the inclusion of these provisions conflicts with a number of federal court decisions that have held that a state cannot use the compacting process to impose state tort law upon tribal gaming operations." Doc. 35-1, 10:6-9. In support, the Tribal Plaintiffs cite to Pueblo of Santa Ana v. Nash, 972 F. Supp. 2d 1254 (D.N.M. 2013) and Navajo Nation v. Dalley, 896 F.3d 1196 (10th Cir. 2018).

In Pueblo of Santa Ana, the gaming compact included the provision:

A. Policy Concerning Protection of Visitors. The safety and protection of visitors to a Gaming Facility is a priority of the Tribe, and it is the purpose of this Section to assure that any such persons who suffer bodily injury or property damage proximately caused by the conduct of the Gaming Enterprise have an effective remedy for obtaining fair and just compensation. To that end, in this Section, and subject to its terms, the Tribe agrees to carry insurance that covers such injury or loss, agrees to a limited waiver of its immunity from suit, and agrees to proceed

9

1   either in binding arbitration proceedings or in a court of competent jurisdiction, at
    the visitor's election, with respect to claims for bodily injury or property damage
2   proximately caused by the conduct of the Gaming Enterprise. For purposes of this
    Section, any such claim may be brought in state district court, including claims
3   arising on tribal land, unless it is finally determined by a state or federal court that
    IGRA does not permit the shifting of jurisdiction over visitors' personal injury suits
4   to state court.

5   Pueblo of Santa Ana, 972 F. Supp. 2d at 1256-57.  The court concluded IGRA did not permit

6   shifting the jurisdiction of these types of tort claims to state courts, reasoning "[Section

7   2710(d)(3)(C)](ii), the only subparagraph in this section of the statute that mentions jurisdiction,

8   permits an allocation of jurisdiction between the State and the Indian tribe, only as necessary for

9   the enforcement of laws and regulations of the State or Indian tribe, that are directly related to, and

10  *necessary for, licensing and regulation* of class III gaming activities. The Court finds no

11  justification for concluding that the IGRA intends the extension of state court jurisdiction for any

12  other purpose than resolution of issues involving the licensing and regulation of class III gaming.

13  A personal injury claim arising from the negligent serving of alcohol has no bearing whatsoever

14  on the licensing or regulation of class III gaming activities." Pueblo of Santa Ana, 972 F. Supp. 2d

15  at 1264, emphasis in original.  Similarly, in Navajo Nation, the Tenth Circuit was faced with a

16  similar jurisdiction shifting provision for personal injury claims arising from inside casino

17  facilities and interpreted the language of Section 2710(d)(3)(C)(i) and (ii) as insufficient to permit

18  that kind of agreement under IGRA. See Navajo Nation, 896 F.3d at 1209-10.

19      The State Defendants point out that the language they sought to add to the gaming compact

20  did not try to shift jurisdiction from tribal to state courts but only required the Tribal Plaintiffs to

21  adopt "a state-law legal standard for tribal courts to apply when adjudicating personal injury

22  claims relating to the operation of their Gaming Operation, Gaming Facility, or Gaming

23  Activities." Doc. 42, 20:8-10.  The State Defendants argument has merit as Pueblo of Santa Ana

24  and Navajo Nation held that shifting jurisdiction of such claims from tribal courts to state courts

25  was not a permitted topic of negotiation under IGRA but did not speak to the question of

26  importing state legal standards into tribal law.

27      The Tribal Plaintiffs also argue, in the alternative, that this demand for conforming tribal

28  law to state law violated IGRA because it is too broad as it covered "all claims of bodily injury,

10

1  personal injury, or property damage directly arising out of, connected with, or relating to the

2  operation of the Gaming Operation, Gaming Facility, or the Gaming Activities, including but not

3  limited to injuries resulting from entry onto the Tribe's land for purposes of patronizing the

4  Gaming Facility or providing goods or services to the Gaming Facility, provided that such injury

5  occurs at the Gaming Facility or on a road accessing the Facility exclusively." Doc. 34-17. RON

6  Vol. 16, 9139.

7       As the Ninth Circuit has described it, the question is whether the topic "is so attenuated

8  from gameplay that it falls outside of paragraph (3)(C)(vii)." Chemehuevi Indian Tribe, 919 F.3d

9  at 1153, citing 25 U.S.C. § 2710(d)(3)(C)(vii).  Turning again to Coyote Valley II, the Ninth

10 Circuit reasoned that "Without the 'operation of gaming activities,' the jobs this provision covers

11 would not exist; nor, conversely, could Indian gaming activities operate without someone

12 performing these jobs." Coyote Valley II, 331 F.3d at 1116.  As discussed above, Coyote Valley II

13 permitted the negotiation of labor representation over support staff jobs in addition to workers

14 directly performing gaming functions; the language covered "Class III Gaming Employees and

15 other employees associated with the Tribe's Class III gaming enterprise, such as food and

16 beverage, housekeeping, cleaning, bell and door services, and laundry employees at the Gaming

17 Facility or any related facility, the only significant purpose of which is to facilitate patronage at

18 the Gaming Facility." Id.

19       In the present case, the proposed language appears to only cover individuals who travel to

20 the casino for the purpose of taking part in gaming activities and without whom the gaming

21 activities would not prosper.  The State Defendants sought to set legal standards for personal

22 injury claims that would not have arisen but for the gaming activity and for which there is a

23 connection to the gaming activity.  The provision governs claims persons might have against the

24 Tribal Plaintiffs on the grounds of the gaming facilities.  While this is at the very edge of

25 relevance, it can be reasonably argued that the topic is still within the scope of 25 U.S.C. §

26 2710(d)(3)(C)(vii).  The State Defendants' attempt to negotiate the issue is not per se evidence of

27 bad faith.  However, this is a subject for which the State Defendants need to provide meaningful

28 concessions. See Big Lagoon Rancheria, 759 F. Supp. 2d at 1162.

**3. Spousal and Child Support**

The State Defendants initially sought to have the Tribal Plaintiffs directly recognize and provide automatic compliance with state spousal and child support orders:

> (e) As a matter of comity, the Tribe shall, with respect to the earnings of any person employed at the Gaming Operation or Gaming Facility, comply with all earnings withholding orders for support of a child, or spouse or former spouse, and all other orders by which the earnings of an employee are required to be withheld by an employer pursuant to chapter 5 (commencing with section 706.010) of division 1 of title 9 of part 2 of the California Code of Civil Procedure, and with all earnings assignment orders for support made pursuant to chapter 8 (commencing with section 5200) of part 5 of division 9 of the California Family Code or section 3088 of the California Probate Code.

Doc. 34-5, RON Vol. 4, 1592.  Through negotiation, this was changed to:

> (d) Under principles of comity, the Tribe shall enact an ordinance granting its tribal court, or if it has no tribal court, a hearing officer appointed by the Tribe, jurisdiction and authority to recognize and enforce tribal or state court child or spousal support judgments entered against any person employed at the Gaming Operation or Gaming Facility (Family Support Ordinance). The failure of the Tribe to comply with the Family Support Ordinance shall not constitute a material breach of this Compact. The Tribe shall promulgate the Family Support Ordinance within sixty (60) days after the effective date of this Compact. The Family Support Ordinance must incorporate the following provisions:
>
> (1) At a hearing at which the employee is given personal notice, the tribal court or hearing officer shall recognize and enforce any state court child or spousal order presented to the tribal court or hearing officer, unless the employee can prove by a preponderance of evidence presented, any of the following: (i) that the state court that entered the judgment did not have personal jurisdiction over the employee; (ii) the state court did not have jurisdiction over the subject matter; (iii) the judgment was obtained by fraud that deprived the employee of an adequate opportunity to present his/her case; (iv) the judgment conflicts with another final conclusive judgment of a court of competent jurisdiction; or (v) the state court judge was biased against the employee.
>
> (2) The Gaming Facility shall, upon being presented with a tribal court judgment or hearing officer decision that recognizes the state court judgment: (i) withhold from the employee's work check any amount awarded by the tribal court or hearing officer against the employee and necessary to satisfy all or a portion of the state court judgement recognized by the tribal court or hearing officer, and (ii) remit the amount withheld to the party in whose favor the judgment was entered. The Tribe's grant of jurisdiction to the tribal court or hearing officer shall include a procedure allowing the employee to apply for a claim of exemption from all or a portion of the judgment to pay for the employee's necessities of life as defined in the Ordinance.

Doc. 35-17, RON Vol 16, 9144-45.  The Tribal Plaintiffs argue that "the recognition and enforcement of state spousal and child support orders is not related in any way to the operation of

12

1   'gaming activities' at the Tribes' gaming facilities." Doc. 35-1, 21:17-19.  The State Defendants

2   do not provide an argument specifically addressed at spousal and child support.

3       This is a topic that falls beyond the permitted scope.  Again, the standard is whether the

4   topic "is so attenuated from gameplay that it falls outside of paragraph (3)(C)(vii)." Chemehuevi

5   Indian Tribe, 919 F.3d at 1153, citing 25 U.S.C. § 2710(d)(3)(C)(vii).  The State Defendants were

6   seeking to include regulations on legal rights that exist independently of any gaming operations.

7   Spousal and child support obligations are affected by employment and income but would still exist

8   even in the absence of the gaming related job.  The Ninth Circuit found employment regulations

9   directly related to the operation of gaming activities because "Without the 'operation of gaming

10  activities,' the jobs this provision covers would not exist; nor, conversely, could Indian gaming

11  activities operate without someone performing these jobs." Coyote Valley II, 331 F.3d at 1116.

12  With employment and personal injury regulations, the State Defendants were trying to regulate the

13  relationship between the Tribal Plaintiffs and persons working at or enjoying the services of the

14  gaming facilities; the nexus of those relationships was the gaming activity.  With spousal and child

15  support, the State Defendants were arguably trying to regulate the relationship between the

16  employees and third party family members who have no connection with the gaming activity; the

17  nexus of those relationships was not the gaming activity.  This is a topic which pulled the

18  negotiations into a field wholly collateral to the operation of gaming facilities.

19      Even if such payments were proper topics of negotiation, the mechanism by which the

20  State Defendants sought to enforce those claims were improper.  The original language sought to

21  have the Tribal Plaintiffs directly enforce state court orders.  Instead of having the issue resolved

22  by tribal courts, the execution was meant to be automatic.  That is, the relevant court making

23  decisions was to be a state court.  In that way, this is akin to the jurisdiction shifting which was

24  prohibited by Pueblo of Santa Ana v. Nash, 972 F. Supp. 2d 1254 (D.N.M. 2013) and Navajo

25  Nation v. Dalley, 896 F.3d 1196 (10th Cir. 2018).

26      The State Defendants' attempt to negotiate the issue of spousal and child support is per se

27  evidence of bad faith.  The State Defendants have to make a strong demonstration of good faith to

28  rebut this conclusion. See Rincon, 602 F.3d at 1036 ("Because we hold above that general fund

13

revenue sharing is neither authorized by IGRA nor reconcilable with its purposes, it is difficult to imagine what concessions the State could offer to rebut the strong suggestion of bad faith arising from such demands.").

**4. Environmental Laws and Local Authorities**

The State Defendants sought to include provisions that set up a system of environmental review:

**Sec. 11.1.  Off-Reservation Environmental Impact Requirement Procedures.**

The Tribe shall not commence construction on any Project until the requirements of section 11.0 and any dispute resolution procedures related to the Project initiated pursuant to sections 11.0 or 13.0 are completed.

(a) If the scope of a Project would allow the Tribe to operate no more than a cumulative total of three-hundred forty-nine (349) Gaming Devices and upon the completion of the Project the Tribe will operate no more than a cumulative total of three hundred forty-nine (349) Gaming Devices in all of its Gaming Facilities, the procedures specified in sections 11.3 through 11.5 and, if required under section 11.5, subdivision (g), the Tribal Environmental Impact Document (TEID) procedures of sections 11.6 through 11.10, shall apply to the Project.

(b) If, upon the completion of a Project, the Tribe will operate a cumulative total of three hundred fifty (350) Gaming Devices or more in all its Gaming Facilities, the procedures specified in sections 11.3 through 11.5 and, if required under section 11.5, subdivision (g), the Tribal Environmental Impact Report (TEIR) procedures of sections 11.10 through 11.17 shall apply to the Project.

(c) Nothing herein shall preclude the Tribe from undertaking multiple activities that may constitute Projects.

(d) To the extent any terms in this section 11.0 are not defined in this Compact, they will be interpreted and applied consistent with the policies and purposes of the California Environmental Quality Act, California Public Resources Code section 21000 et seq. (CEQA) and the National Environmental Policy Act of 1969, 42 U.S.C. § 4332 et seq. (NEPA).

**Sec. 11.2.  Tribal Environmental Protection Ordinance.**

The Tribe shall adopt an ordinance incorporating the processes and procedures required under section 11.0 (Tribal Environmental Protection Ordinance).  In fashioning the Tribal Environmental Protection Ordinance, the Tribe will incorporate the relevant policies and purposes of NEPA and CEQA consistent with legitimate governmental interests of the Tribe and the State, as reflected in section 11.0.  No later than one hundred and twenty (120) days before starting the environmental review process required by section 11.0 for a Project, the Tribe will submit its Tribal Environmental Protection Ordinance to the State for review.  If within sixty (60) days after receiving it, which time shall be extended up to an additional thirty (30) days upon the State's request, the State identifies aspects of

the Tribal Environmental Protection Ordinance that it believes are inconsistent with section 11.0, the matter will be resolved in accordance with the dispute resolution provisions of section 13.0 and the Project may not commence until that dispute is resolved.

Doc. 34-17. RON Vol. 16, 9102-103.  Of note, the State Defendants are asking for compliance with CEQA and NEPA in these provisions.  This language would apply to "Projects":

Sec. 2.25.  "Project" means (i) the construction of a new Gaming Facility, (ii) a renovation, expansion or modification of an existing Gaming Facility, or (iii) other activity involving a physical change to the reservation environment, provided the principal purpose of which is directly related to the activities of the Gaming Operation, and any one of which may cause a Significant Effect on the Off-Reservation Environment.  For purposes of this definition, section 11.0, and Appendix B, "reservation" refers to the Tribe's Indian lands within the meaning of IGRA or lands otherwise held in trust for the Tribe by the United States.

which further references "Gaming Facilities" and "Gaming Operations":

Sec. 2.13.  "Gaming Facility" or "Facility" means any building in which Gaming Activities or any Gaming Operations occur, or in which the business records, receipts, or funds of the Gaming Operation are maintained (but excluding off-site facilities primarily dedicated to storage of those records, and financial institutions), which may include parking lots, walkways, rooms, buildings, and areas that provide amenities to Gaming Activity patrons, if and only if, the principal purpose of which is to serve the activities of the Gaming Operation, provided that nothing herein prevents the conduct of class II gaming (as defined under IGRA) therein.

Sec. 2.14. "Gaming Operation" means the business enterprise that offers and operates Gaming Activities, whether exclusively or otherwise, but does not include the Tribe's governmental or other business activities unrelated to the operation of the Gaming Facility.

Doc. 34-17. RON Vol. 16, 9035 and 9032.  The Tribal Plaintiffs argue that this level of environmental regulation is not permitted. Doc. 35-1, 14:24.

Further, the Tribal Plaintiffs particularly object to a push by the State Defendants to require them to negotiate environmental mitigation with local governments:

**Sec. 11.15.  Intergovernmental Agreement.**

(a) Before the commencement of a Project, and no later than the issuance of the Final TEIR to the County and/or the City, the Tribe shall offer to commence government-to-government negotiations with the County and/or the City, and upon the County's and/or the City's acceptance of the Tribe's offer, the parties shall negotiate on a government-to-government basis and shall enter into enforceable written agreements (hereinafter "intergovernmental agreement") with the County and/or the City with respect to the matters set forth below:

(1) The timely mitigation of any Significant Effect on the Off-Reservation Environment (which effects, consistent with the policies and purposes of NEPA and CEQA as described in Appendix B, Off-Reservation Environmental Impact

1    Analysis Checklist), where such effect is attributable, in whole or in part, to the
2    Project, unless the parties agree, based upon the information required by section
     11.14, subdivision (e), that the particular mitigation is infeasible, taking into
     account economic, environmental, social, technological, or other considerations.

3    Doc. 34-17, RON Vol. 16, 9125.  A failure to come to an agreement would force the Tribal

4    Plaintiffs to enter into arbitration with the local government entities:

5    **Sec. 11.16.  Arbitration.**

6    To foster good government-to-government relationships and to assure that the
     Tribe is not unreasonably prevented from commencing a Project and benefiting
7    therefrom, if an intergovernmental agreement with the County, the City, or Caltrans
     if required by section 11.15, subdivision (b), is not entered within seventy-five (75)
8    days of the submission of the Final TEIR, or such further time as the Tribe and the
     County, the City, or Caltrans (for purposes of this section the "parties") may agree
9    in writing, any party may demand binding arbitration before a JAMS arbitrator
     pursuant to JAMS Comprehensive Arbitration Rules with respect to any remaining
10   disputes arising from, connected with, or related to the negotiation.

11   Doc. 34-17, RON Vol. 16, 9127.

12        The Northern District has held that "the State may not impose its environmental and land

13   use regulations on the Tribe absent authority from Congress. However, the State could negotiate

14   for compliance with such regulations to the degree to which they are 'directly related' to the

15   Tribe's gaming activities or can be considered 'standards' for the operation of and maintenance of

16   the Tribe's gaming facility under 25 U.S.C. § 2710(d)(3)(C)(vi) and (vii)" with a key limitation

17   that "the State may not in good faith insist upon a blanket provision in a tribal-State compact with

18   Big Lagoon which requires future compliance with all State environmental and land use laws, or

19   provides the State with unilateral authority to grant or withhold its approval of the gaming facility

20   after the Compact is signed." Big Lagoon Rancheria, 759 F. Supp. 2d at 1153-54 (describing an

21   earlier ruling dealing with the same parties on the same issue).  Ultimately, the Northern District

22   held that "The State may request environmental mitigation measures so long as they (1) directly

23   relate to gaming operations or can be considered standards for the operation and maintenance of

24   the Tribe's gaming facility, (2) are consistent with the purposes of IGRA and (3) are bargained for

25   in exchange for a meaningful concession." Id. at 1162; see also Rincon, 602 F.3d at 1033 ("(a) for

26   uses 'directly related to the operation of gaming activities' in § 2710(d)(3)(C)(vii), (b) consistent

27   with the purposes of IGRA, and (c) not 'imposed' because it is bargained for in exchange for a

28   'meaningful concession.'").

16

The proposed language suggests that the State Defendants were seeking to impose chunks of environmental laws on the Tribal Plaintiffs' "Gaming Facilities." While it is not as broad as a blanket requirement to comply with all future environmental law, it is significant. The State Defendants argue that they "did not insist on any particular terms, including on a need for an agreement with the local county government regarding mitigation." Doc. 43, 9:1-3. The State Defendants point out that in February 2017, they changed the counterparty for the mitigation agreement, substituting the State of California in place of the local counties. Doc. 34-12, RON Vol. 11, 3716-18. But, the extensive language quoted above describing the requirement of having intergovernmental agreement with counties and/or cities was the "State's full draft compact for CTSC discussion October 15, 2018." Doc. 34-17, RON Vol. 16, 9125. And, as late as September 2019, the State Defendants were still talking about "provisions that require intergovernmental agreements with affected local governments regarding mitigation and arbitration when the tribe and the locals cannot reach agreement." Doc. 34-23, RON Vol. 22, 9957. The record appears to show a consistent push to subject the Tribal Plaintiffs to a comprehensive environmental regulatory scheme and negotiation with local governmental entities.

Turning to the three part test, since all of the regulations appear tied to "Gaming Facilities," they are related to the operation of gaming activities. In part, IGRA was "intended to promote tribal development." Rincon, 602 F.3d at 1034, citing 25 U.S.C. § 2702. There is no suggestion that the environmental provisions were added as a hidden means to prevent the building, renovation, or expansion of gaming facilities by Tribal Plaintiffs. As part of the overall negotiation to renew the 1999 Compact, they can be said to be consistent with the promotion of tribal development. Thus, the State Defendants' attempt to negotiate the issue is not per se evidence of bad faith. However, this is a subject for which the State Defendants need to provide meaningful concessions.

**5. Tribal Nation Grant Fund**

The 1999 Compacts included provisions requiring the Tribal Plaintiffs to contribute to the Revenue Sharing Trust Fund ("RSTF") and the Special Distribution Fund ("SDF"). The RSTF

17

provides funding to Indian tribes in California that do not operate gaming facilities.  The SDF creates an account to pay for programs designed to offset any negative effects of gaming activities.  The Ninth Circuit ultimately ruled that requiring Indian tribes to fund the RSTF and SDF was within the scope of Section 2710(d)(3)(C)(vii) and that the state offered "meaningful concessions" in exchange for that funding.  Coyote Valley II, 331 F.3d 1094, 1111-14.  The Ninth Circuit said that the state's concession to Indian tribes of an exclusive right to operate class III gaming throughout California was "exceptionally valuable and bargained for" but could not be considered a concession in any future negotiations. Rincon, 602 F.3d at 1037.

With renegotiation, the State Defendants sought to have the Tribal Plaintiffs contribute to a new Tribal Nation Grant Fund ("TNGF").  The TNGF would fund a program that provides grants to Indian tribes in California that do not operate gaming facilities or operate only limited gaming facilities.  In negotiations, the Tribal Plaintiffs proposed a RSTF II instead of the TNGF in July 2019; the State Defendants expressed openness to considering that alternative proposal. Doc. 34-24, RON Vol. 22, 9948.  Soon thereafter, the Tribal Plaintiffs withdrew from the CTSC.

The Tribal Plaintiffs argue that this is a form of taxation that is not permitted by IGRA. Doc. 35-1, 28:4-9.  From what is presented, the purpose of TNGF appears to be similar to the RSTF.  There was negotiation over what form the fund should take.  As the Ninth Circuit has found the RSTF appropriate under IGRA so long as there were meaningful concessions offered in exchange, the same result should hold true in this case. See Coyote Valley II, 331 F.3d at 1111.

**C. Meaningful Concessions**

State Defendants argue that, on the topics the Tribal Plaintiffs objected to, their negotiating positions were never inflexible or absolute but rather they were always open to discussion and compromise. Doc. 38-1, 12:18-25.  They point out that it was ultimately the Tribal Plaintiffs who walked away from negotiations. Doc. 38-1, 14:12-13.  However, given the nature of the topics the State Defendants raised, meaningful concessions are required to rebut the evidence the Tribal Plaintiffs have pointed to that suggest bad faith.  What constitutes a meaningful concession is something beyond that which is negotiated as part of a standard IGRA compact that only covers

1   topics directly dealing with gaming activity. <u>Rincon</u>, 602 F.3d at 1039 ("gaming rights that tribes

2   are entitled to negotiate for under IGRA, like device licensing and time, see § 2701(d)(3)(C)(vi),

3   cannot serve as consideration for general fund revenue sharing; the consideration must be for

4   something 'separate' than basic gaming rights.").

5          To establish that meaningful concessions were made, the State Defendants need to argue

6   specifically what concessions were offered in exchange for what topics: "the State argues that the

7   value of its offers during compact negotiations should be analyzed as a whole, not piecemeal….we

8   disagree that the State makes 'meaningful concessions' whenever it offers a bundle of rights more

9   valuable than the status quo. As previously explained, IGRA endows states with limited

10  negotiating authority over specific items. Accepting the State's 'holistic' view of negotiations

11  would permit states to lump together proposals for taxation, land use restrictions, and other

12  subjects along with IGRA class III gaming rights. Such a construction of IGRA would violate the

13  purposes and spirit of that law." <u>Rincon</u>, 602 F.3d at 1040.  "Although we do not inquire into the

14  adequacy of consideration as a general rule, when the consideration must necessarily be divided

15  into two parts--that which IGRA contemplates and that which is outside of IGRA--we cannot

16  bundle the rights being negotiated and compare the whole to the status quo as our method for

17  determining whether the concessions are meaningful. The consideration in exchange for the

18  revenue sharing must be independently meaningful in comparison to the status quo, i.e. not

19  illusory (or illegal) if standing alone." <u>Id</u>. at 1040 n.23.

20         The State Defendants have not provided granular argument concerning meaningful

21  concessions.  They provide a list of concessions and then argue generally "Taken together, these

22  concessions made throughout State Defendants' proposed compacts are significant. They provide

23  Plaintiff Tribes with a longer compact with no requirement to acquire or pay for Gaming Device

24  licenses, and the ability to resolve all patron disputes, employee claims, and damage claims within

25  their tribal court system. And potentially most notable, under the State's proposed compact the

26  Plaintiff Tribes could be eligible to pay no SDF, RSTF, or TNGF payments. This is a valuable

27  proposal that greatly improves upon the Plaintiff Tribes' existing 1999 Compacts. To the extent

28  that any material concessions are required under IGRA, this proposal satisfies any such

obligations." Doc. 43, 19:4-10.

First, the ability to resolve disputes within the tribal court system is the legal default position.  Indeed, as discussed above, changing the venue of patron personal injury and employee claims from tribal court to state court is not a permitted topic of IGRA negotiation. See Pueblo of Santa Ana v. Nash, 972 F. Supp. 2d 1254 (D.N.M. 2013); Navajo Nation v. Dalley, 896 F.3d 1196 (10th Cir. 2018).  Second, this appears to be the type of holistic analysis Rincon disapproved of.  It is the burden of State Defendants to link specific concessions as being offered in return for specific topics. See Big Lagoon Rancheria, 759 F. Supp. 2d at 1162 ("However, the record of negotiations does not show that either of these offers was related to the proposed environmental mitigation measures; instead, they appear to have been offered in exchange for general fund revenue sharing.").  The State Defendants also have to explain in detail how much a benefit the concessions actually would provide to the Tribal Plaintiffs. See Id. (the concessions listed by the state were "(1) the right to operate up to 349 gaming devices and (2) continued receipt of RSTF payments, even though Big Lagoon would no longer be a non-gaming tribe….Without any context or comparison, the State simply declares that they were valuable. This is not sufficient.").

In this case, the record of negotiations is many thousands of pages long.  "The district court need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found." Carmen v. S.F. Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001). While the State Defendants assert that they have negotiated in good faith in general, they have not provided citation to specific instances during the negotiation to support their assertion.

**D. Conclusion**

The Tribal Plaintiffs have met their burden of producing evidence the State Defendants did not negotiate in good faith by raising topics in negotiations that were beyond the scope permitted by IGRA or which required some form of meaningful concession in return.  The State Defendants have not met their burden of providing affirmative evidence that they did negotiate in good faith sufficient to rebut the Tribal Plaintiffs' evidence.  It is adjudicated the State Defendants did not

negotiate in good faith.

IGRA's remedial procedures are as follows:

(iii) If, in any action described in subparagraph (A)(i), the court finds that the State has failed to negotiate in good faith with the Indian tribe to conclude a Tribal-State compact governing the conduct of gaming activities, the court shall order the State and the Indian Tribe [tribe] to conclude such a compact within a 60-day period.

….

(iv) If a State and an Indian tribe fail to conclude a Tribal-State compact governing the conduct of gaming activities on the Indian lands subject to the jurisdiction of such Indian tribe within the 60-day period provided in the order of a court issued under clause (iii), the Indian tribe and the State shall each submit to a mediator appointed by the court a proposed compact that represents their last best offer for a compact. The mediator shall select from the two proposed compacts the one which best comports with the terms of this Act and any other applicable Federal law and with the findings and order of the court.

25 U.S.C. § 2710(d)(7)(B).

## IV. Order

The Tribal Plaintiffs' motion for summary judgment is GRANTED.

The State Defendants' motion for summary judgment is DENIED.

Accordingly, the parties ARE HEREBY ORDERED to proceed pursuant to the remedial process set forth in the IGRA, 25 U.S.C. § 2710(d)(7)(B)(iii)-(vii).  As the immediate remedy, the parties ARE HEREBY ORDERED to conclude a gaming compact within 60 days of the date of this order or to provide a proposed stipulation to extend the time for concluding the gaming compact.

IT IS SO ORDERED.

Dated:   March 31, 2021          _____

                                         SENIOR  DISTRICT  JUDGE